## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA *ex rel.*,** ) | |
| **KRISHA TURNER, CRYSTAL DERCHER** ) | |
| **and AMANDA REYNOLDS** ) | |
| ) | **Case No.** 12-2122-EFM-KGS |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **FILED IN CAMERA AND** |
| ) | **UNDER SEAL** |
| **HOPE CANCER INSTITUTE, INC.** ) | |
| **4215 Shawnee Drive** ) | |
| **Kansas City, KS 66106** ) | |
| ) | |
| **and** ) | |
| ) | |
| **DR. RAJ SADASIVAN** ) | |
| **26109 East Blue Mills Road** ) | |
| **Sibley, MO 64088** ) | |
| ) | |
| **Defendants.** ) | |

### COMPLAINT

Plaintiffs Relators Krisha Turner, Crystal Dercher and Amanda Reynolds, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 (herein "FCA"), file this Complaint against Hope Cancer Institute, Inc. (herein "HCI") and Dr. Raj Sadasivan (herein "Sadasivan"). In support, Relators allege as follows:

### INTRODUCTION

1.      Krisha Turner, Crystal Dercher and Amanda Reynolds (hereinafter "Relators") bring this action on behalf of the United States of America against Defendants for treble damages and civil penalties arising from the Defendants' false statements and false claims in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq*. The violations involve false statements and false claims regarding oncology and related services provided by HCI and Sadasivan (herein "Defendants").

2.      As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), Relators are also providing

the Attorney General of the United States and the United States Attorney for the District of Kansas with a statement of all material evidence and information related to this Complaint. This disclosure statement is supported by material evidence establishing the existence of Defendants' false claims, which are known to Relators at the time of the filing of this Complaint. The statement includes attorney-client communications and work product of Relators' attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation. Therefore, Relators understand this disclosure to be confidential.

## JURISDICTION AND VENUE

3.        This action arises under the False Claims Act, 31 U.S.C. §§ 3729 et seq. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

4.        Venue is proper pursuant to 28 U.S.C. § 1391(h) and (c) because Defendant HCI is located and does business in this District.

5.        Relator Krisha Turner is a citizen of the United States and a resident of Independence, Missouri. From approximately October of 2005 until January of 2012, Turner was employed by HCI as a Certified Professional Coder (herein "CPC") and an Administrative Assistant.

6.        Relator Crystal Dercher is a citizen of the United States and a resident of Independence, Missouri. From approximately September of 2004 until February of 2012, Dercher was employed by HCI as an Administrative Assistant.

7.        Relator Amanda Reynolds is a citizen of the United States and a resident of Independence, Missouri. From approximately October of 2004 until February of 2012, Reynolds was employed by HCI as a Billing Supervisor and a CPC.

8.      Relators are the original sources of this information to the United States, based on their direct an independent knowledge of the information on which the allegations are based and which they have voluntarily provided to the United States along with filing this action.

9.      HCI is a Kansas corporation that is owned and operated by Sadasivan.  HCI's staff includes Sadasivan as a practicing oncologist and various support staff.  Sadasivan is the only physician associated with HCI.

10.     Through HCI, Sadasivan performs oncology and related services to cancer patients.  Most notably, HCI and Sadasivan provide chemotherapy medications to cancer patients.

## FACTUAL BACKGROUND

**A.      Federally Funded Health Insurance Programs**

11.     In 1965, Congress established the Medicare Program to provide health insurance for the elderly and disabled. Medicare Program payments come from the Medicare Trust fund, which is funded by working Americans through payroll deductions and by government contributions.

12.     The Medicare Program enables the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

13.     Private insurance companies contract with the Government to manage much of the daily administration and operation of the Medicare Program. These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund. These carriers, operate pursuant to 42 U.S.C.A. § 1395(h) and 1395(u) and rely on the good faith and truthful representations of health care providers when processing claims.

14.     The Medicaid Program provides care for indigent people. Although administered by individual states, the Medicaid Program is funded primarily by the federal government.

15.     One critical factor to the success of the Medicare and Medicaid Programs is that medical providers bill the Medicare Trust Fund and the Medicaid Program only in accordance with medical treatments or services as they are actually performed.

16.     The United States of America (herein "United States"), through its agency, the Department of Health and Human Services (herein "HHS") and, specifically the Health Care Financing Administration (herein "HCFA"), now known as the Center for Medicare and Medicaid Services (herein "CMS"), administers the Medicare program to provide health insurance for the elderly and the disabled.

17.     The amount of payment from the United States pursuant to the Medicare and Medicaid programs for physician's services, such as the oncology services performed by Sadasivan on behalf of HCI, are determined by such health care providers' completion and submission of "CMS 1500" forms.  More specifically, the provider completes CMS 1500 forms by inputting thereon the relevant "Current Procedure Terminology" (herein "CPT") Codes.

18.     As explained in detail herein, Sadasivan, acting both as an agent of HCI and for his own personal benefit as the owner and principal officer of HCI, engaged in widespread and pervasive fraud against the United States by "upcoding" services on CMS 1500 forms.

19.     As to some services reported on a CMS 1500 form, CMS responds to receiving such a completed CMS 1500 by requesting the provider to send to CMS medical documentation to substantiate that the service was provided to the patient as reported. After CMS receives sufficient medical documentation from the provider to substantial that such services were provided to a patient as previously reported on a completed CMS 1500 form from the provider, CMS will pay the provider for such services.

20.     As explained in detail herein, Sadasivan, acting both as an agent of HCI and for his own

personal benefit as the owner and principal officer of HCI, engaged in widespread and pervasive fraud against the United States by providing falsely completed CMS 1500 forms and falsified medical records to CMS.

**B.      Defendants' Schemes To Defraud**

## *RITUXAN DOSAGE FRAUD*

21.     During late 2010, HCI transitioned to the use of "Electronic Medical Records" ("EMR") for purposes of maintaining the medical records used to respond to requests by CMS to substantiate that a service was provided to a patient as reported on a completed CMS 1500 form.

22.     After HCI transitioned to the use of EMR, Relators noticed an electronic file for a patient of HCI and Sadasivan named Glenna Pigg.  Relators found this curious because each of the three Relators was personally familiar with all of Sadasivan's patients at HCI, and none of them were acquainted with a Glenna Pigg.

23.     Adding to the perplexity, the EMR for Glenna Pigg were "unlocked" on the computer system at HCI, which meant that such EMR were malleable. As to all other EMR for all other patients at HCI, after medical services were performed and recorded on the EMR, the EMR for the patient were "locked" on the computer system at HCI, meaning that such EMR were not malleable.

24.     Among the chemotherapy drugs prescribed by Sadasivan and administered to patients at HCI is Rituxan, an extremely expensive medication.

25.     The high cost of Rituxan is compounded by the typical regimen by which it is prescribed—patients receive a weekly dose for twenty-six weeks, then continue to receive four dose every three month over a two-year period.  Thus, the total regimen of Rituxan entails 58 dosages to a patient.

26.    Due to the exceptionally high cost of Rituxan, upon receiving a completed CMS 1500 form stating that a patient at HCI had received Rituxan, CMS would often request medical documentation from HCI regarding the administration of such Rituxan to the patient as a condition of CMS paying HCI for such services.

27.    Another curiosity taking place at HCI after the transition to EMR was that on several occasions, Relators observed Sadasivan physically cutting and pasting, with a paper cutter and tape, EMR. Sadasivan would then photocopy the altered EMR.  Sadasivan would then fax the photocopies of the altered EMR to CMS.  Relators suspected that Sadasivan was providing those photocopies of altered EMR to CMS in response to CMS's requests for medical documentation to substantiate the receipt of Rituxan by patients.

28.    In January of 2012, the three Relators collectively decided to investigate the strange convergence of the unlocked EMR of a phantom patient and Sadasivan's faxing of altered EMR to CMS.  They discovered documents confirming that over a period of approximately the preceding twelve months, Sadasivan had faxed to CMS altered EMR concerning thirteen patients. Specifically, the "locked" EMR of those thirteen patients indicated that they had received 500 mg dosages of Rituxan, but the altered EMR that Sadasivan had faxed to CMS stated that those patients had received dosages of 1000 mg of Rituxan.  The Relators had thus definitively discovered the Sadasivan was defrauding the United States by falsely enhancing Medicare and Medicare payments concerning patient dosages of  Rituxan.

29.    Relators also discovered that the unlocked phantom EMR of Glenna Pigg indicated 1000 mg dosages of Rituxan.  Thus, it appeared that Sadasivan was using the malleable EMR of Glenna Pigg as a template for the falsified faxes of EMR to CMS.  That is, it appeared that Sadasivan would physically cut the (malleable) section on the Glenna Pigg EMR indicating a

dosage of 1000 mg of Rituxan, paste that section over the EMR of the patient who had received only 500 mg of Rituxan, and fax it to CMS.

30.     HCI fraudulently received substantially higher payments from the United States for Medicare and Medicaid patients than HCI was entitled to receive as to each dosage of Rituzan provided to a patient whose dosages of Rituxan was in fact 500 mg but for whom Sadasivan provided falsified medical records to CMS stating that the patient had received 1000 mg dosages of Rituxan.

31.     After reviewing EMR of HCI over a period of about one year, Relators uncovered such fraud by Sadasivan and HCI related to thirteen patients.  Each patient receiving Rituxan is given a regimen of 58 dosages over two-years and twenty-six weeks. Relators estimate that Medicare and Medicaid pay providers just over $500 per 100 mg of Rituxan administered to patients. Thus, Relators estimate that HCI received excess payments from the United States in the amount of just over $2,500 for each false claim of 1000 mg of Rituxan that was actually only 500 mg. Thus, over a regimen of 58 dosages per patient, HCI defrauded the United States out of just over $145,000 for each such patient.

### *UNSUPERVISED INFUSIONS FRAUD*

32.     Rituxan, and certain other chemotherapy medications, are administered to patients at HCI intravenously through cardiac portals that have been surgically implanted into the patients for the purpose of receiving such chemotherapy medications.

33.     Rituxan is administered to patients at HCI in the form of an intravenous drip through such cardiac portals.  The infusion of Rituxan into a patient takes approximately four hours from the time the drug begins to be infused into the patient's cardiac portal until the drug is fully infused into the patient (hereafter a "four-hour infusion").

34.     Other chemotherapy medications that are infused into cancer patients intravenously through a surgically implanted cardiac portal at HCI entail an infusion drip lasting approximately two hours (hereafter a "two-hour infusion").

35.     At HCI, patients are scheduled for chemotherapy medication infusions at 8:00 a.m., 10:00 a.m. and 1:00 p.m., Monday through Thursday.   Typically, between six and nine patients are scheduled to begin infusions at 8:00 a.m., between six and nine patients are scheduled to begin infusions at 10:00 a.m., and between two and four patients are scheduled to being infusions at 1:00 p.m.   All four-hour infusions are scheduled for 8:00 a.m.   Typically, between one and three of the infusions scheduled for 8:00 a.m. are four-hour infusions; all other scheduled infusions are two-hour infusions.

36.     Virtually every day that any of the three Relators has worked in the office of HCI, they have witnessed Sadasivan leaving the HCI facility between 10:15 a.m. and 11:00 a.m.   On numerous occasions, he has stated that the reason he routinely leaves the HCI facility between 10:15 a.m and 11:00 a.m. is to perform his "rounds" (i.e. to see hospitalized patients) at Providence Medical Center in Kansas City, Kansas.   Sadasivan typically returns to the HCI facility between 1:00 p.m. and 1:30 on Mondays, Wednesdays and Thursdays.   He typically returns to the HCI facility at 1:00 p.m. on Mondays and Wednesdays for scheduled office visits, and on Thursdays he typically returns to the HCI facility at about 1:30.   On Tuesdays, however, Sadasivan remains absent from the HCI facility until about 3:30; since September of 2011, he has been performing work on Tuesday afternoons at Washington Medical Group at 1610 Washington in Kansas City, Kansas.

37.     According to Mapquest, the HCI facility and Providence Medical Center are 10.56 miles apart, and travel between the two facilities takes fourteen minutes.

38.     According to Mapquest, the HCI facility and the Washington Medical Group are 7.26 miles apart, and travel between the two facilities takes eleven minutes.

39.     Sadasivan routinely completed CMS 1500 forms and submitted such forms to CMS seeking payment to HCI for chemotherapy infusions.   Those completed CMS 1500 forms routinely utilized CPT codes that required Sadasivan's presence in the office suite of HCI for the entire duration of such infusions.  As to four-hour infusions that began at 8:00 a.m., and as to two-hour infusions that began at 10:00 a.m., Sadasivan was virtually never present in the office suite of HCI for the duration of those infusions—during at least part of those infusions, he was almost always away from the HCI facility for the stated purposes of seeing patients at Providence Medical Center.  Moreover, as to many of the infusions that began at 1:00 p.m., Sadasivan was similarly not present in the HCI facility until about 1:30 p.m.

40.     As described above, Sadasivan, on behalf of himself and as an agent of HCI, routinely submitted false and fraudulent CMS 1500 forms for virtually all HCI cancer patients receiving four-hour infusions, for virtually all HCI cancer patients who received two-hour infusions that began at 10:00 a.m., for virtually all HCI cancer patients who received two-hour infusions that began at 1:00 p.m. on Tuesdays since September of 2011, and for many HCI cancer patients who received two-hour infusions that began at 1:00 p.m. on Thursdays.

### *OFFICE VISIT FRAUD*

41.     Sadasivan regularly scheduled office visits (as opposed to scheduled infusions) for patients at HCI during only four and a half hours a week. His weekly schedule for office visits was:  Monday and Wednesday from 1:00 p.m. to 2:30 p.m. and Thursday from 8:30 a.m. to 10:00 a.m.

42.     Despite Sadasivan only providing four and a half hours per week for office visits to HCI

patients, Sadasivan regularly completed and submitted CMS 1500 forms for approximately twenty-five to thirty "office visits" with HCI patients per week.

43.     Moreover, Sadasivan routinely utilized a CPT code of 99214 on the CMS 1500 forms he submitted for HCI patients regarding patients' office visits. Code 99214 can be used for office visits that would typically entail twenty-five minutes of face-to-face time between physician and patient and/or family.  Code 99214 also requires that the office visit included two of three of the following: a detailed history; a detailed examination; and medical decisions of moderate complexity.  By contrast, office visits subject to a CPT of 99212 typically entail ten minutes of face-to-face time between physician and patient and/or family.

44.     Also, in order to justify receipt of payment from the United States for any such office visit, the patient's medical files must include sufficient documentation to substantiate the extent and type of counseling and/or examination allegedly received by the patients.

45.     Simply stated, Sadasivan routinely submitted false CMS 1500 forms for office visits. Patients' office visits at HCI virtually never entailed anywhere near twenty-five minutes of face-to-face intereactions between the patient and Sadasivan.  Such office visits also virtually never included either a detailed medical history or detailed examination of the patient.  The office visit virtually always entailed less than or little more than ten minutes of such face-to-face interactions, so that such office visits should have been coded as CPT code 99212, rather than CPT code 99214.

46.     Lastly, none, or virtually none, of the medical documentation for patients of Sadasivan at HCI are sufficient to substantiate a CPT code of 99214 for such office visits.

## MULTIPLE USE OF SINGLE-DOSE VIALS FRAUD

47.     Some chemotherapy medications that are administered intravenously are distributed in "single-dose vials" while others are distributed in "multi-dose vials."  As to any medication that is distributed in single-dose vials, any unused portion of the medication remaining in a vial after any portion thereof has been administered to a patient cannot be administered to any other patient; instead, the unused portion of the medication remaining in the vial must be discarded. By contrast, as to medications distributed in multi-dose vials, unused portions of the medication that remain in a vial after the other portion thereof has been administered to one patient can be administered to a subsequent patient.

48.     Medicare and Medicaid provide for payment to service providers for administering single-does vial medications based on the total amount of the medication contained in the vial(s), including both the administered and discarded portions thereof.  By contrast, Medicare and Medicaid provide for payment to service provides for administering multi-dose vial medications based only of the amount of the medication actually administered to the patient. The obvious purpose of paying a service provider for unused portions of single-dose vial medications is to offset the provider's wholesale cost of the unused portion of the medication that is discarded.

49.     Sadasivan routinely administered the unused portions of single-dose vial medications to subsequent patients, rather than discarding them.  In doing so, he fraudulent submitted claims and received payment from the United States for the entirety of partially used single-dose vials of medication, then administered the remainder of the medication in those vials to subsequent patients.

## Count I

### *FALSE BILLINGS FOR SERVICES NOT RENDERED*

50.     Relators re-allege and incorporate paragraphs the allegations and averments set forth above.

51.     Defendants, knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false or fraudulent claims for payment by the federally funded health insurance programs, in violation of, inter alia, 31 U.S.C. § 3729(a)(1).

52.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, inter alia, 31 § 3729(a)(2).

53.     Defendants defrauded the government by submitting and receiving payment for false or fraudulent claims, in violation of, inter alia, 31 U.S.C. § 3729(a)(3).

54.     Unaware of the falsity of Defendants' claims and/or statements, and in reliance on the accuracy thereof, the United States paid for services provided to individuals insured by federally funded health insurance programs.

55.     As a result of the Defendants fraudulent actions, the United States has been, and will continue to be, severely damaged.

### DEMAND FOR JURY TRIAL

Relators, on behalf of themselves and the United States, demand a jury trial on all claims alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Relators respectfully pray that judgment be entered against Defendants as follows:

A.    That Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §3729, et seq.;

B.    That Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

C.    That Relators be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. §3730(d);

D.    That Relators be awarded all costs of this action, including attorneys fees and costs pursuant to 31 U.S.C. §3730(d);

E.    That Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

F.    That Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

G.    That the United States and Relators, Krisha Turner, Crystal Dercher and Amanda Reynolds recover such other relief as the Court deems just and proper.

Respectfully submitted,

BRADY & ASSOCIATES

Mark A. Kistler, KS #17171
10901 Lowell Avenue, Suite 280
Overland Park, KS 66210
(913) 696-0925
(913) 696-0468 (fax)
mkistler@mbradylw.com
**ATTORNEYS FOR RELATORS**